## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, in his capacity )<br>as the executor of the Estate of )<br>JANE DOE, in his personal )<br>capacity, and as the personal )<br>representative of JANE DOE, )<br>  )<br>Plaintiff, )<br>  )<br>vs. )<br>  )<br>SHEIKH USAMA BIN-MUHAMMAD )<br>BIN-LADEN, a/k/a OSAMA BIN LADEN, )<br>Afghanistan, )<br>  )<br>and )<br>  )<br>AL QAEDA, a/k/a ISLAMIC ARMY, )<br>Afghanistan, )<br>  )<br>and )<br>  )<br>THE TALIBAN, )<br>Kandahar, Afghanistan, )<br>  )<br>and )<br>  )<br>THE ISLAMIC EMIRATE OF )<br>AFGHANISTAN, a/k/a THE ISLAMIC )<br>STATE OF AFGHANISTAN, )<br>c/o The Permanent Representative of )<br>the Islamic State of Afghanistan )<br>to the United Nations )<br>360 Lexington Avenue )<br>11th Floor )<br>New York, NY, 10017, )<br>  )<br>and )<br>  ) | **COMPLAINT**<br><br>Civil Action No. 01-2516 (RWR) |

| | |
|---|---|
| THE REPUBLIC OF IRAQ, | ) |
| c/o The Permanent Representative of | ) |
| Iraq to the United Nations, | ) |
| 14 East 79th Street | ) |
| New York, NY, 10021, | ) |
| | ) |
| or | ) |
| | ) |
| c/o The Algerian Embassy, | ) |
| Iraqi Interests Section, | ) |
| 1801 P Street, N.W. | ) |
| Washington, DC 20036. | ) |
| | ) |
|           Defendants. | ) |
| | ) |

Plaintiff John Doe, by counsel, brings this action in his capacity as the executor of the estate of Jane Doe, in his personal capacity, and as the personal representative of Jane Doe, deceased. Plaintiff hereby sues Sheikh Usama Bin-Muhammad Bin-Laden, a/k/a Osma Bin Laden ("Bin Laden"), Al Qaeda, a/k/a Islamic Army ("Al Qaeda"), the Taliban, the Islamic Emirate of Afghanistan, a/k/a the Islamic State of Afghanistan ("Afghanistan"), and the Republic of Iraq ("Iraq"), arising from the terrorist attacks of September 11, 2001.

### JURISDICTION AND VENUE

1. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1366.

2. Defendants Afghanistan and Iraq are subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, because their conduct falls within the exceptions to foreign sovereign immunity set forth at 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7).

3.	Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(d) and 1391(f)(4).

## PARTIES

4.	Plaintiff John Doe is United States national. Plaintiff also is the executor of the estate of Jane Doe, and the personal representative of Jane Doe, deceased. Plaintiff and Plaintiff's decedent were husband and wife. Plaintiff's decedent also was a national of the United States.

5.	Defendant Sheikh Usama Bin-Muhammad Bin-Laden, a/k/a Osama Bin Laden ("Bin Laden"), formerly was a national of Saudi Arabia and is now an alien of unknown nationality. He is presently believed to be in Afghanistan. Bin Laden heads and directs the activities of Al Qaeda, a/k/a Islamic Army, an international terrorist organization.

6.	Defendant Al Qaeda, a/k/a Islamic Army, ("Al Qaeda") is an unincorporated association organized to perpetrate acts of international terrorism against the United States and others. Al Qaeda is presently headquartered in Afghanistan, but is believed to have networks of terrorist "cells" throughout the world.

7.	Defendant Taliban is an unincorporated association that served as the *de facto*, if not the *de jure*, government of Afghanistan from approximately 1996 until after September 11, 2001. The Taliban presently is headquartered in Kandahar, Afghanistan. The Taliban has declared itself to be the legitimate government of Afghanistan, but currently is not recognized by the United States or any other foreign state. Prior to September 11, 2001, the Taliban was recognized by at least three foreign states, including Pakistan, Saudi Arabia, and the United Arab Emirates.

8.	Defendant Islamic Emirate of Afghanistan, a/k/a the Islamic State of Afghanistan ("Afghanistan"), is a foreign sovereign state located in central Asia and sharing borders with Iran, Turkmenistan, Uzbekistan, Tajikistan, and Pakistan. According to the U.S. Central Intelligence

Agency ("CIA"), Afghanistan has no functioning government at this time. However, the United Nations recognizes the government of Burhanuddin Rabbani as the official government of Afghanistan. That government can be located c/o The Permanent Representative of the Islamic State of Afghanistan to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY, 10017.

9.      Defendant the Republic of Iraq ("Iraq") is a foreign sovereign state located in the Middle East and sharing borders with Saudi Arabia, Jordan, Syria, Turkey and Kuwait. The United State does not have formal diplomatic relations with the current government of Iraq, which can be located c/o The Permanent Representative of Iraq to the United Nations, 14 East 79th Street, New York, NY, 10021. The United States maintains in Interest Section in the Polish Embassy in Baghdad, Iraq, located at P.O. Box 2051 Hay Babel, Baghdad, Iraq, and Iraq maintains an Interest Section in the Algerian Embassy in Washington, D.C., located at 1801 P Street, N.W. Washington, DC 20036.

## STATEMENT OF FACTS

10.     On or about February 23, 1998, Bin Laden and Al Qaeda issued a Fatwah (religious decree) urging Jihad (holy war) against the United States and all Americans. The Fatwah issued by Bin Laden and Al Qaeda stated, in pertinent part, as follows:

> [I]n compliance with God's order, we issue the following Fatwah to all Muslims: The ruling to kill the Americans and their allies -- civilians and military -- is an individual duty for every Muslim who can do it any country in which its is possible to do it, . . . We -- with God's help -- call on very Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it.

In calling on all Muslims to kill Americans "wherever and whenever" they can be found, and in carrying out the terrorist attacks described below, Bin Laden and Al Qaeda purposefully directed their illegal, tortious, unlawful, and murderous actions and conduct towards the United States.

11. On the morning of Tuesday, September 11, 2001, nineteen agents of Bin Laden and Al Qaeda hijacked four fully-fueled jetliners in the United States with the intention of crashing them into the World Trade Center in New York City, the Pentagon outside Washington, D.C., and one other unknown target in Washington, D.C., presumably either The White House or the Capitol.

12. U.S. officials have reportedly concluded that fifteen of the hijackers were Saudi Arabian nationals. Two others were from the United Arab Emirates. One was from Lebanon, and one was from Egypt. All of the hijackers reportedly entered the United States on student visas. The hijackers also reportedly had received support from Al Qaeda "cells" located the Federal Republic of Germany, Spain, the United Kingdom, the United Arab Emirates, and Afghanistan.

13. At approximately 8:46 a.m., one of the hijacked jetliners, American Airlines Flight 11 carrying ninety-two persons, struck the North Tower of the World Trade Center.

14. At approximately 9:02 a.m., a second hijacked jetliner, United Airlines Flight 175 carrying sixty-five persons, struck the South Tower of the World Trade Center.

15. At approximately 9:37 a.m., a third hijacked jetliner, American Airlines Flight 77 carrying sixty-four persons, struck the Pentagon.

16. At approximately 9:50 a.m., the South Tower of the World Trade Center, the second tower to be attacked, collapsed with thousands of people remaining inside.

17. At approximately 10:10 a.m., a fourth hijacked jetliner, United Airlines Flight 93 carrying forty-five persons, crashed into a field in Western Pennsylvania as a result of courageous actions by the passengers and crew.

18. At approximately 10:29 a.m., the North Tower of the World Trade Center, the first tower to be attacked, collapsed with thousands of people remaining inside.

19. On Tuesday, September 11, 2001, Plaintiff's decedent was attending a meeting on an upper floor of the South Tower when it was struck by United Airlines Flight 175 several floors below. She remains missing and is presumed dead.

20. Plaintiff's decedent was forty-seven years old. She is survived by Plaintiff, her husband of many years, two teenagers, and her parents.

21. Since approximately 1996, Bin Laden and Al Qaeda have received material support and assistance from Afghanistan, by and through officials, agents and/or employees of the Taliban, its *de facto*, if not *de jure*, government, in carrying out terrorist attacks against the United States, including, on information and belief, the September 11, 2001 attacks. The Taliban also has allowed Bin Laden and Al Qaeda to operate training camps inside Afghanistan from which they plan, train for, and carry out terrorist attacks against the United States, including, on information and belief, the September 11, 2001 attacks. U.S. investigators reportedly believe that at least four of the nineteen hijackers from the September 11, 2001 attacks received training at camps in Afghanistan run by Bin Laden and Al Qaeda.

22. The U.S. Government also has declared that the Taliban has allowed Bin Laden and Al Qaeda to use Afghanistan "as a safe haven and base of operations" from which to carry out

terrorist attacks on the United States. As President William J. Clinton declared in a July 4, 1999 Executive Order:

> I, William Jefferson Clinton, President of the United States of America, find that the actions and policies of the Taliban in Afghanistan, in allowing territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama Bin Laden and the al-Qaeda (sic) organization who have committed and threaten to continue to commit acts of violence against the United States and its nationals, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat.

Executive Order 13129 of July 4, 1999. President George W. Bush continued this same Executive Order, using nearly identical language, in a notice issued on June 30, 2001.

23. On information and belief, Bin Laden, Al Qaeda, and the hijackers also received material support and assistance from Iraq, by and through its officials, agents, and/or employees, to carry out terrorist attacks on the United States, including the September 11, 2001 attacks.

24. In their February 23, 1998 Fatwah, Bin Laden, and Al Qaeda expressly referenced the United States' "continuing aggression" towards Iraq as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" the are found:

> The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless.

Bin Laden's and Al Qaeda's Fatwah also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States alleged "eagerness to destroy Iraq."

25. Bin Laden reportedly visited Baghdad for consultations in March 1998. Giovanni De Stefano, an international lawyer visiting Baghdad on business, had a chance encounter with Bin Laden in the lobby of the Al-Rashid Hotel, during which the two men introduced themselves and

engaged in polite conversation. De Stefano did not, at the time, recognize Bin Laden's name. Five months after the chance encounter, agents of Bin Laden and Al Qaeda attacked the American embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania.

26. Between April 25 and May 1, 1998, two of Bin Laden's senior military commanders, Muhammad Abu-Islam and Abdallah Qassim, reportedly visited Baghdad for discussions with Saddam Hussein's son -- Qusay Hussein -- the "czar" of Iraqi intelligence matters. Qusay Hussein's participation in the meetings highlights the importance of the talks in both symbolic and practical terms. As a direct result of these meetings, Iraq reportedly made commitments to provide training, intelligence, clandestine Saudi border crossings, and weapons and explosives to support Al Qaeda.

27. By mid-June, 1998, operatives of Bin Laden and Al Qaeda reportedly were at the al-Nasiriyah training camp in Iraq receiving instruction and training from Iraqi intelligence and military officials on reconnaissance and targeting American facilities and installations for terrorist attacks. Another group of Bin Laden and Al Qaeda operatives from Saudi Arabia reportedly were trained by intelligence officials in Iraq to smuggle weapons and explosives into Saudi Arabia, and, upon returning to Saudi Arabia, successfully smuggled weapons and explosives into that country. A third group of Bin Laden and Al Qaeda operatives reportedly received a month of sophisticated guerrilla operations training from Iraqi intelligence officials later in the Summer of 1998.

28. Bin Laden reportedly sought to strengthen and reinforce the support he and Al Qaeda received from Iraq. In mid-July 1998, Bin Laden reportedly sent Dr. Ayman al-Zawahiri, the Egyptian co-founder of Al Qaeda, to Iraq to meet with senior Iraqi officials, including Iraqi vice president Taha Yassin Ramadan. The reported purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign against the United States. Iraqi officials reportedly pledged

Iraq's full support and cooperation on the condition that Bin Laden and Al Qaeda not incite the Iraqi Muslim Brotherhood, a radical Islamic organization, against the regime of Iraqi dictator Saddam Hussein. Zawahiri reportedly toured a potential site for a new headquarters for Bin Laden and Al Qaeda near al-Fallujah in Iraq and observed training by Iraqi intelligence officials of Bin Laden and Al Qaeda operatives at al-Nasiriyah. In recognition of Bin Laden's and Al Qaeda's leadership role in the terrorist war against the United States, Iraqi officials allowed Zawahiri to assume formal command over the al-Nasiriyah training camp in the name of Bin Laden and Al Qaeda.

29. By mid-November 1998, Saddam Hussein reportedly came to the conclusion (with the advice and prompting of his son and intelligence chief, Qusay), that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of deflecting U.S. attempts to topple his regime.

30. Shortly thereafter, Iraqi intelligence officials reportedly met with Bin Laden in Afghanistan. Bin Laden, Al Qaeda, and Iraq reportedly agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States. Iraq also reportedly agreed to provide Bin Laden and Al Qaeda with the assistance of an expert in chemical weapons, and Bin Laden reportedly agreed to hunt down Iraqi opposition leaders who cooperated with the United States against Hussein. In furtherance of this agreement, Bin Laden reportedly dispatched four hundred of Al Qaeda's "Afghan" Arabs to Iraq to fight Kurds.

31. Following a four day air strike by the United States in December 1998, Iraqi trade minister Muhammad Mahdi Salah reportedly stated that he expected terrorist activities against the United States to increase as a result of the bombing of Iraq. The Arabic language daily newspaper *Al-Quds al-Arabi* first raised the issue of cooperation between Iraq, Bin Laden and Al Qaeda in a late

December 1998 editorial, which predicted that "President Saddam Hussein, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama bin-Laden, whom the United States considers to be the most wanted person in the world." The editorial noted that this type of cooperation was very likely considering that "bin-Laden was planning moving to Iraq before the recent strike."

32.  Following the December 1998 air strikes, Saddam Hussein reportedly dispatched Faruq al-Hijazi to Kandahar, Afghanistan in order to meet with Bin Laden. Hijazi, the former deputy chief of Iraqi intelligence, had first met Bin Laden in 1994. During his visit to Kandahar, Hijazi reportedly offered expanded cooperation and assistance to Bin Laden and Al Qaeda, as well as a re-extension of the offer of shelter and hospitality Iraq previously extended to Bin Laden and Al Qaeda. Bin Laden reportedly agreed in principle to give Iraq assistance in a revenge campaign against the United States, but suggested further study and coordination before committing to a specific course of action or agreeing to a particular terrorist strike.

33.  To demonstrate Iraq's commitment to Bin Laden and Al Qaeda, Hijazi reportedly presented Bin Laden with a pack of blank, official Yemeni passports, supplied to Iraqi intelligence from their Yemeni contacts. Hijazi's visit to Kandahar was reportedly followed by a contingent of Iraqi military intelligence officials who provided additional training and instruction to Bin Laden and Al Qaeda operatives in Afghanistan. These Iraqi officials reportedly included members of "Unit 999," a group of elite, Iraqi intelligence officials who provided advanced sabotage and infiltration training and instruction for Al Qaeda operatives.

34. In addition to the al-Nasiriyah training camp, by January 1999, Bin Laden and Al Qaeda operatives also were reportedly being trained by Iraqi intelligence and military officers at training camps on the outskirts of Baghdad.

35. Following the Hijazi meetings, Qusay Hussein reportedly dispatched representatives to follow-up with Bin Laden and obtain his firm commitment to exact revenge against the United States for the December 1998 bombing campaign. Iraq reportedly offered Bin Laden and Al Qaeda an open-ended commitment to joint operations against the United States and its "moderate" Arab allies in exchange for an absolute guarantee that Bin Laden, Al Qaeda, and their allies would not attempt to overthrow Saddam Hussein's regime in Iraq.

36. Israeli sources reportedly claim that, for the past two years, Iraqi intelligence officers have been shuttling back and forth between Baghdad and Afghanistan. According to the Israelis, one of these Iraqi intelligence officers, Salah Suleiman, was captured last October by Pakistani officials near the border between Pakistan and Afghanistan.

37. In January 1999, Iraq reportedly began reorganizing and mobilizing intelligence front operations throughout Europe in support of Bin Laden and Al Qaeda.

38. According to Czech intelligence sources, Mohammad Atta, the operational ringleader of the September 11, 2001 terrorist attacks, met in June 2000 with Ahmed Khalil Ibrahim Samir al-Ani, a consul and second secretary at the Iraqi embassy in Prague. Al-Ani is one of Iraqi's most highly decorated intelligence officers, a special forces veteran, and a senior leader of Iraq's "M-8" special operations branch. Other reports indicate that Al-Ani may have met with another hijacker, Khalid Almihdar.

39.     Czech Interior Minister Stanislav Gross has confirmed that Atta met with al-Ani in early April 2001 in Prague. Atta also reportedly met with the Iraqi ambassador to Turkey and the former Iraqi deputy intelligence director, Farouk al-Hijazi, in Prague sometime in early April 2001.

40.     Czech intelligence sources further report that Atta and al-Ani embraced upon meeting at Prague's Ruzyne airport, and that Atta may have visited the Czech capitol on four other occasions.

41.     Czech intelligence sources also reported that al-Ani had been under surveillance because he had been observed apparently surveying the Radio Free Europe/Radio Liberty headquarters in Prague. Czech authorities believed the site had been selected for attack by terrorists. Later in 2001, al-Ani was expelled from the Czech Republic for espionage activities.

42.     Reports of additional intelligence ties between Bin Laden, Al Qaeda and Iraq continue to mount. The CIA reportedly believes Iraq provided falsified passports for the nineteen hijackers who carried out the September 11, 2001 terrorist attacks. Further, senior U.S. intelligence sources have revealed that, in the Spring of 2001, Marwan al-Shehri and Ziad Jarrah -- two of Atta's closest associates and members of the Al Qaeda "cell" in the Federal Republic of Germany -- met with known Iraqi intelligence agents outside the United States.

43.     Italian security sources have reported that Iraq made use of its embassy in Rome to foster and cultivate Iraq's partnership with Bin Laden and Al Qaeda. Habib Faris Abdullah al-Mamouri, a general in the Iraqi secret service, and, from 1982 to 1990, a member of Iraq's "M-A" special operations branch charged with developing links with Islamist militants in Pakistan, Afghanistan, and the states of the Persian Gulf, was stationed in Rome as an "instructor" for Iraqi diplomats. Al-Mamouri reportedly met with Mohammed Atta in Rome, Hamburg, and Prague. Al-Mamouri has not been seen in Rome since July 2001, shortly after he last met with Atta.

44.     Recent Iraqi defectors provide additional details of Iraq's support for international terrorism throughout the 1990s. The Public Broadcasting Service documentary program entitled "Frontline" interviewed former Iraqi intelligence and army officers with first-hand accounts of highly secret installations run by an international terrorist known to Iraqi staffers only as "the Ghost." "The Ghost" is reported to be Abdel Hussein, the chief trainer at a training camp inside Iraq, which includes the fuselage of a Boeing 707 jetliner that is used to practice hijacking scenarios. U.N. inspectors independently confirmed the existence of this particular training camp inside Iraq.

45.     The Iraqi defector known as "Saddam's Bomb-maker," Dr. Khidhir Hamza, who served as Iraq's Director of Nuclear Weaponization, analyzes Iraqi's sponsorship of Bin Laden and Al Qaeda as follows:

> What I think is there is somehow a change in the level of the type of operation Bin Laden has been carrying [out]. What we are looking at initially is more or less just attempts to blow some buildings, just normal use of explosives for a terrorist. What we have in the September 11 operation, [is a] tightly controlled, very sophisticated operation; the type an Iraqi intelligence agency, well versed in the technology [could pull off]. ... So my thinking is a guy sitting in a cave in Afghanistan is not the guy who will do an operation of this caliber. It has to have in combination with it a guy with the sophistication and know-how on how to carry these things.
>
> . . . Iraq [also] has a history of training terrorists, harboring them, and taking good care of them, by the way. A terrorist is well cared for with Saddam. So he has a good reputation in that type of community, if you like.

46.     Several leading authorities on Saddam Hussein, Bin Laden, and Al Qaeda concur on the likelihood of Iraq's sponsorship and coordination of the September 11, 2001 terrorist attacks. The former head of Israel's Mossad secret service, Rafi Eitan, and former CIA Director James Woolsey, share the view that Iraq, Bin Laden and Al Qaeda conspired in the attacks. Their views also are shared by Laurie Mylroie, an academic and Iraqi affairs expert at the American Enterprise

Institute in Washington, D.C.. Mylroie cites the role of Iraqi operatives in the 1993 bombing of the World Trade Center to support her claim that the September 11, 2001 attacks are a matter of unfinished business for Iraq, which considers itself to be at war with the United States.

47.   As a direct and proximate result of the intentional, willful, and malicious acts of terrorism by Defendants on September 11, 2001, Plaintiff, Plaintiff's decedent, and Plaintiff's decedent's other family members suffered severe and permanent personal injuries, damages, and losses, including but not limited to the following:

(a)   The emotional distress, mental anguish, fear of death, and pain and suffering inflicted on Plaintiff's decedent prior to the collapse of the South Tower and Plaintiff's decedent's death.

(b)   The economic losses and loss of accretions suffered by Plaintiff's decedent's estate as a result of her death.

(c)   The loss of consortium, solatium, and society suffered by Plaintiff and Plaintiff's decedent's other family members.

(d)   The emotional distress, mental anguish, and pain and suffering of Plaintiff and Plaintiff's decedent's other family members.

(e)   The economic losses suffered by Plaintiff and Plaintiff's decedent's other family members.

**COUNT I**
(Assault and Battery -- Defendants Bin Laden,
and Al Qaeda)

48.   Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

49.   As a result of the September 11, 2001 intentional hijacking and suicide attack by agents of Defendants Bin Laden and Al Qaeda, Plaintiff's decedent, who was on one of the

uppermost floors of Tower One when it was attacked, was placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily contact, from which she ultimately died.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and against Defendants Bin Laden and Al Qaeda, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

### COUNT II
(False Imprisonment -- Defendants Bin Laden
and Al Qaeda)

50.   Plaintiff realleges paragraphs 1 through 49 as if fully set forth herein.

51.   As a result of the September 11, 2001 intentional hijacking and suicide attack by agents, officials and/or employees of Defendants Bin Laden and Al Qaeda, thousands of innocent persons, including Plaintiff's decedent, were intentionally confined and otherwise trapped within Tower One prior to its collapse. Plaintiff's decedent was conscious of her confinement and never consented to it.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and against Defendants Bin Laden and Al Qaeda, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

### COUNT III
(Intentional Infliction of Emotional Distress -- Defendants Bin Laden,
and Al Qaeda)

52.   Plaintiff realleges paragraphs 1 through 51 as if fully set forth herein.

53. The September 11, 2001 intentional hijacking and suicide flights into the World Trade Center were the result of intentional, extreme, outrageous conduct that exceeded all reasonable bounds of decency.

54. Defendants Bin Laden and Al Qaeda knew the September 11, 2001 intentional hijacking and suicide attacks would inflict severe emotional distress and mental anguish on thousands of innocent persons inside the World Trade Center, including Plaintiff's decedent, and Defendants Bin Laden and Al Qaeda intended to inflict severe emotional distress and mental anguish on these innocent persons.

55. Defendants Bin Laden and Al Qaeda also knew or should have known that family members of innocent persons trapped inside the World Trade Center, including Plaintiff, would view contemporaneous and replayed images of the suicide attacks and subsequent destruction the World Trade Center through the news media and suffer severe emotional distress and mental anguish as a result. Defendants Bin Laden and Al Qaeda intended to inflict severe emotional distress and mental anguish among family members of the victims and others who witnessed the attacks.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and in favor of Plaintiff personally, and against Defendants Bin Laden and Al Qaeda, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

**COUNT IV**
(Anti-Terrorism Act Claim, 18 U.S.C. §2333 -- Defendants Bin Laden,
Al Qaeda and the Taliban)

56. Plaintiff realleges paragraphs 1 through 55 as if fully set forth herein.

57.     Plaintiff and Plaintiff's decedent, who are and were at all times nationals of the United States, suffered substantial injuries to their persons, property, and business by reason of the acts of international terrorism perpetrated by Defendants Bin Laden and Al Qaeda on September 11, 2001 that resulted in the death of Plaintiff's decedent, a substantial portion of the planning, training and preparation for which occurred primarily outside the territorial jurisdiction of the United States.

58.     Defendant Taliban's provision of material support and assistance to Bin Laden and Al Qaeda in Afghanistan, as well as its provision of a safe haven and base of operations to Bin Laden and Al Qaeda in Afghanistan from which they carried out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks that resulted in the death of Plaintiff's decedent, also constitutes acts of international terrorism that caused substantial injuries to the persons, property, and business of Plaintiff and Plaintiff's decedent.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and in favor of Plaintiff personally and in his capacity the personal representative of Jane Doe, and against Defendants Bin Laden, Al Qaeda, and the Taliban, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, treble damages, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT V
(Conspiracy -- Defendants Taliban, Afghanistan and Iraq)

59.     Plaintiff realleges paragraphs 1 through 58 as if fully set forth herein.

60.     Defendants Bin Laden, Al Qaeda, the Taliban, Afghanistan, and Iraq tacitly and/or expressly agreed to conduct illegal and unlawful terrorist attacks on the United States, including, on information and belief, the terrorist attacks of September 11, 2001. To this end, the Taliban,

Afghanistan, and Iraq provided material support and resources to Bin Laden, Al Qaeda, and their agents, as well as a safe haven and base of operation from which to conduct terrorist attacks on the United States, including, on information and belief, the September 11, 2001 attacks.

61.    In furtherance of this conspiracy, agents of Bin Laden and Al Qaeda carried out the terrorist attacks of September 11, 2001, which caused the destruction of the World Trade Center and the death of Plaintiff's decedent.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and in favor of Plaintiff personally, and against Defendants Taliban, Afghanistan and Iraq, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, punitive damages (Defendant Taliban only), attorneys fees, and such other relief as the Court deems just and proper.

**COUNT VI**
(Wrongful Death -- Defendants Bin Laden, Al Qaeda,
the Taliban, Afghanistan and Iraq)

62.    Plaintiff realleges paragraphs 1 through 61 as if fully set forth herein.

63.    Plaintiff's decedent is survived by several family members, including Plaintiff and two teenagers, who are entitled to recover damages from Defendants for the wrongful death of Plaintiff's decedent.

WHEREFORE, Plaintiff demands judgment be entered in favor of Plaintiff in his capacity as the personal representative of Jane Doe, and against Defendants Bin Laden, Al Qaeda, the Taliban, Afghanistan, and Iraq, jointly and severally, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interests, costs, punitive damages (Defendants Bin laden, Al Qaeda and the Taliban only), attorneys fees, and such other relief as the Court deems just and proper.

## COUNT VI
(Anti Terrorism and Effective Death Penalty Act Claim,
28 U.S.C. § 1605(a)(7) -- Defendant Iraq)

64. Plaintiff realleges paragraphs 1 through 63 as if fully set forth herein.

65. The death of Plaintiff's decedent, who was a national of the United States at the time, resulted from acts of extrajudicial killing and aircraft sabotage.

66. These acts of extra judicial killing and aircraft sabotage were perpetrated by agents of Bin Laden and Al Qaeda, who received material support and resources from Defendant Iraq.

67. Agents, officials or employees of Defendant Iraq provided material support and resources to Bin Laden and Al Qaeda while acting in the scope of their offices, agencies, or employment. Similar conduct, if committed by agents, officials or employees of the United States, would be actionable.

68. Defendant Iraq had been designated by the U.S. Government as a state sponsor of terrorism at the time of the attacks.

WHEREFORE, Plaintiff demands judgment be entered in favor of Jane Doe's estate and in favor of Plaintiff personally and in his capacity as personal representative of Jane Doe, and against Defendant Iraq, for an amount in excess of Thirty Million Dollars ($30,000,000.00), plus interest, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

JUDICIAL WATCH, INC.


_____
Larry Klayman, Esq.
D.C. Bar No. 334581
Paul J. Orfanedes, Esq.
D.C. Bar No. 429716
Suite 725
501 School Street, S.W.
Washington, DC 20024
(202) 646-5172

Attorneys for Plaintiff