## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE, in his capacity as the )
executor of the Estate of JANE DOE, )
in his personal capacity, and in his )
capacity as personal representative )
of JANE DOE, )
                    )
       Plaintiff, )
                    )
vs. )     Civil Action No. 01-2516 (RWR)
                    )
OSAMA BIN LADEN, *et al.,* )
                    )
       Defendants. )
_____ )

## PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANTS AFGHANISTAN, THE TALIBAN, AL QAEDA, AND BIN LADEN

Plaintiff, by counsel and pursuant to Rule 55 of the Federal Rule of Civil Procedure and

28 U.S.C. § 1608(e), respectfully requests that a final default judgment be entered in Plaintiff's

favor against Defendants Islamic Emirate of Afghanistan ("Afghanistan"), the Taliban, Al

Qaeda, and Osama Bin Laden ("Bin Laden"). As grounds therefor, Plaintiff states as follows:

## MEMORANDUM OF LAW

**I.**    **Introduction.**

This action arises from the September 11, 2001 terrorist attacks, in which Plaintiff's wife,

Wendy Faulkner, was killed. Plaintiff brings this action in his capacity as the executor of his

wife's estate, in his personal capacity, and in his capacity as his wife's personal representative.

Plaintiff sues Defendant Afghanistan for conspiring with Defendants Taliban, Al Qaeda, and Bin

Laden to commit multiple unlawful acts in the course of the September 11, 2001 attacks and for

wrongful death. Plaintiff sues Defendants Al Qaeda and Bin Laden for assault and battery, false

imprisonment, intentional infliction of emotional distress, violation of the Anti-Terrorism Act,

18 U.S.C. § 2331, *et seq*., and wrongful death.  Plaintiff sues Defendant Taliban for violation of

the Anti-Terrorism Act, conspiracy, and wrongful death.

## II.     The Parties.

At all relevant times to this action, Plaintiff, whose real name is Lynn Faulkner, has been

a national of the United States.  Complaint ("Compl.") at ¶ 4; Declaration of Lynn Faulkner

("Faulkner Decl."), attached as Exhibit 1, at ¶ 1.[1]  Plaintiff also is the executor of his wife's

estate and her personal representative.  *Id.*  Mrs. Faulkner was a national of the United States and

only 47 years old when Defendants took her life.  Compl. at ¶¶ 1, 20; Faulkner Decl. at ¶ 4.

Plaintiff and Mrs. Faulkner had been married for 20 years at the time of Mrs. Faulkner's death.

Compl. at ¶ 1; Faulkner Decl. at ¶¶ 3, 5.  Mrs. Faulkner also is survived by two daughters, Loren

and Ashley Faulkner.  Compl. at ¶ 20; Faulkner Decl. at ¶ 6.

Defendant Afghanistan is a foreign sovereign state located in central Asia and shares

borders with Iran, Turkmenistan, Uzbekistan, Tajikistan, and Pakistan.[2]  Compl. at ¶ 8.

Defendant Taliban is an unincorporated association that controlled large portions of the territory

of Defendant Afghanistan from approximately 1996 until after September 11, 2001.  Compl. at ¶

7; The 9/11 Commission Report ("9/11 Rep."), attached as Exhibit 2, at 63-65, 121-126.[3]  At the

---

[1]      Affidavits may be used in proceedings pursuant to 28 U.S.C. § 1608(e).  *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 124 (D.D.C. 2002).

[2]      Plaintiff requests that the Court take judicial notice of this fact pursuant to Fed.R.Evid. 201(b) as the fact is "not subject to reasonable dispute" in that it is either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

[3]      The report of the National Commission on Terrorist Attacks Upon the United States, also known as the "9/11 Commission," is admissible under Rule 803(8)(C) of the Federal

time of the September 11, 2001 terrorist attacks, Defendant Taliban was headquartered in

Kandahar, Afghanistan and had declared itself to be the legitimate government of Defendant

Afghanistan.  Compl. at ¶ 7; 9/11 Rep. at 111, 122, 124.

Defendant Bin Laden formerly was a national of Saudi Arabia and is now an alien of

unknown nationality.  Compl. at ¶ 5; 9/11 Rep. at 57.  Defendant Bin Laden presently is believed

to be inside Defendant Afghanistan or in the bordering provinces of Pakistan.  Compl. at ¶ 5;

9/11 Rep. at 338.  Defendant Bin Laden heads and directs the activities of Defendant Al Qaeda,

an international terrorist organization founded by Defendant Bin Laden in 1998 to perpetrate acts

of international terrorism against the United States and other states.  Compl. at ¶¶ 5 and 6; 9/11

Rep. at 55-70, 145.  On August 20, 1998, President William J. Clinton designated Defendant Bin

_____

Rules of Evidence, which states, in pertinent part:

> Records, reports, statements, or data compilations, in any form, of public offices
> and agencies, setting forth ... (C) in civil actions and proceedings ..., factual
> findings resulting from an investigation made pursuant to authority granted by
> law, unless the sources of information or other circumstances indicate lack of
> trustworthiness.

"The clear language of 803(8)(C) and the explication of the rule by the Advisory Committee
establish that official reports are presumptively admissible unless the circumstances indicate a
lack of trustworthiness."  *United States v. American Tel. & Tel. Co.*, 498 F. Supp. 353, 359
(D.D.C. 1980) (quoting *Melville v. American Home Assurance Co.*, 443 F. Supp. 1064, 1115 n.
75 (E.D.Pa.1977), rev'd on other grounds, 584 F.2d 1306 (3d Cir. 1978)).  "[C]ourts have been
liberal in determining admissibility under Rule 803(8)." *Id.* (citing *Baker v. Elcona Homes
Corp.*, 588 F.2d 551, 557 (6th Cir. 1978)).  "(Public) records or reports, by virtue of their being
based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness
to justify their use at trial."  *Id.* at 360 (quoting *Melville*, 443 F. Supp. at 1112).

The 9/11 Commission was authorized and directed under Section 604 of Public Law 107-
306 to investigate and report on the facts and causes relating to the terrorist attacks of September
11, 2001.  *See* 9/11 Commission Report, attached as Exhibit 2, at xv-xviii (Preface).  The report
constitutes the official findings of the 9/11 Commission's investigation and has been relied on by
courts in other lawsuits arising from the September 11, 2001 attacks.  *See Mwani v. Bin Laden*,
417 F.3d 1, 8 (D.C. Cir. 2005).

Laden as a terrorist.  Executive Order 13099 (Aug. 20, 1998), attached hereto as Exhibit 3.  In October 1999, the U.S. Department of State designated Defendant Al Qaeda as a "foreign terrorist organization."  9/11 Rep. at 185.  At all times relevant to the September 11, 2001 terrorist attacks, Defendant Al Qaeda was headquartered in Defendant Afghanistan.  Compl. at ¶ 6; 9/11 Rep. at 63-67, 337.

### III.   Terrorist Atrocities Committed by Defendants Al Qaeda and Bin Laden With the Material Assistance of Defendants Afghanistan and the Taliban Prior to the September 11, 2001 Attacks.

On multiple occasions prior to the September 11, 2001 attacks, Defendants Al Qaeda and Bin Laden perpetrated acts of violence against the United States and its citizens.  Compl. at ¶ 10. In 1992, agents of Defendants Al Qaeda and Bin Laden exploded a bomb at two hotels in Somalia frequented by U.S. troops.  9/11 Rep. at 59.  Two persons, neither of whom were U.S. nationals, were killed.  *Id.*  In 1993, agents of Defendants Al Qaeda and Bin Laden were heard boasting that their assistance led to the downing of two U.S. Black Hawk helicopters, also in Somalia.  *Id.* at 60.  In 1995, a car bomb exploded outside a Saudi-U.S. joint facility in Saudi Arabia, killing five U.S. nationals and two Indians nationals.  *Id.*  Associates of Defendants Al Qaeda and Bin Laden later took "credit" for the explosion.  *Id.*  It is believed that Defendants Al Qaeda and Bin Laden also may have played a role in the 1996 Khobar Towers attack in Saudi Arabia, which killed nineteen Americans and wounded nearly four hundred others.  *Id.*

On or about February 23, 1998, Defendant Bin Laden issued a religious decree, also known as a Fatwah, urging holy war, also known as Jihad, against the United States and all Americans.  Compl. at ¶ 10; 9/11 Rep. at 47.  Defendant Bin Laden called for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any

country in which it is possible to do it." *Id.* The report of the 9/11 Commission summarizes what occurred next:

> Three months later, when interviewed in Afghanistan by ABC-TV, Bin Laden enlarged on these themes. He claimed that it was more important for Muslims to kill Americans than to kill other infidels. 'It is far better for anyone to kill a single American soldier than to squander his efforts on other activities,' he said. Asked whether he approved of terrorism and of attacks on civilians, he replied: 'We believe that the worst thieves in the world today and the worst terrorists are the Americans. Nothing could stop you except perhaps retaliation in kind. We do not have to differentiate between military and civilian. As far as we are concerned, they are all targets.'

9/11 Rep. at 47.

On August 7, 1998, agents of Defendants Al Qaeda and Bin Laden simultaneously exploded car bombs at the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. *Id.* at 68-70. Twelve Americans and over two hundred others, almost all of whom were Kenyan nationals, were killed in the Nairobi blast. *Id.* at 70. Approximately 5,000 persons were injured. *Id.* at 70. Eleven more persons, none of whom were Americans, were killed in the Dar es Salaam bombing. *Id.*

On October 12, 2000, agents of Defendants Al Qaeda and Bin Laden attacked a U.S. Navy destroyer, the U.S.S. Cole, while it was harbored in the Yemeni port of Aden. Seventeen American sailors were killed and at least forty others were wounded. *Id.* at 152-53, 190-91.

Since approximately 1996, Defendants Al Qaeda and Bin Laden have received material support and assistance from Defendant Afghanistan, by and through officials, agents, and/or employees of Defendant Taliban, in carrying out terrorist attacks against the United States. Compl. at ¶¶ 21, 22; 9/11 Rep. at 63-67, 123-25, 156-60, 165-71, 369. As summarized in the 9/11 Report, "Afghanistan was the incubator for al Qaeda and for the 9/11 attacks." *Id.* at 369.

Defendant Taliban allowed Defendants Al Qaeda and Bin Laden to operate training camps inside Defendant Afghanistan from which Defendants Al Qaeda and Bin Laden sifted recruits and planned, trained for, and carried out terrorist attacks against the United States, including the September 11, 2001 attacks. *Id.* at 63-67, 123-25, 156-60, 165-71, 369. Defendant Taliban essentially "open[ed] the doors to all who wanted to come to Afghanistan to train in camps." *Id.* at 66. This sanctuary in Defendant Afghanistan allowed Defendant Al Qaeda to "train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes." *Id.* at 66. According to U.S. intelligence estimates, between 10,000 to 20,000 persons underwent instruction in these camps in Defendant Afghanistan from 1996 through 9/11. *Id.* at 67.

Many of the 19 hijackers from the September 11, 2001 attacks were trained at camps inside Defendant Afghanistan run by Defendants Al Qaeda and Bin Laden. Compl. at ¶ 21; 9/11 Rep. at 156-59, 233-36. In addition to more general training in firearms and withstanding psychological pressure, Defendant Al Qaeda provided specialized instruction in how to conduct hijackings, disarm air marshalls, and take over an airplane cockpit. *Id.* at 236.

Defendant Afghanistan, by and through officials, agents and/or employees of Defendant Taliban, also facilitated meetings and travel for those involved in the September 11, 2001 plot. 9/11 Rep. at 66, 165-69, 235. This included various schemes to falsify passports, visas, and identification cards. *Id.* at 169. These operations were institutionalized to such an extent that Defendant Al Qaeda even operated a passport office at the airport in Kandahar, Afghanistan, which would add or erase entry or exit stamps to create "false trails" in passports. *Id.* at 169, 235.

Defendant Afghanistan, by and through officials, agents and/or employees of Defendant Taliban, was the sole source of financing for Defendant Bin Laden when he arrived  in Defendant Afghanistan, until Defendant Bin Laden was able to reconstitute his fund-raising efforts. *Id.* at 171.  Eventually, Defendant Bin Laden provided $10-$20 million per year to Defendant Taliban in return for safe haven inside Defendant Afghanistan. *Id.* at 171.  Defendant Afghanistan, by and through officials, agents and/or employees of Defendant Taliban, provided additional support by allowing agents and operatives of Defendant Al Qaeda to "travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates." *Id.* at 66.  The state-owned airline of Defendant Afghanistan, Ariana Airlines, was used to courier money into the country for Defendant Al Qaeda. *Id.*

At all relevant times, Defendant Afghanistan, by and through officials, agents and/or employees of Defendant Taliban, was fully aware of the intention of Defendants Bin Laden and Al Qaeda to attack the United States. 9/11 Rep. at 65-66, 250-52.  Despite numerous requests from the United States and others, Defendant Taliban refused to expel Defendants Al Qaeda and Bin Laden from Defendant Afghanistan. *Id.* at 121-22, 125, 176, 182-83, 185, 205.

In 1999, the U.S. Government declared that Defendant Taliban had allowed Defendants Al Qaeda and Bin Laden to use Defendant Afghanistan "as a safe haven and base of operations" from which to carry out terrorist attacks on the United States.  Compl. at ¶ 22.  Specifically, President William J. Clinton declared:

> I, William Jefferson Clinton, President of the United States of America, find that the actions and policies of the Taliban in Afghanistan, in allowing territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama Bin Laden and the al-Qaeda (sic) organization who have committed and threaten to continue to commit acts of violence against the United States and its

nationals, constitute an unusual and extraordinary threat to the national security
and foreign policy of the United States, and hereby declare a national emergency
to deal with that threat.

Compl. at ¶ 22; Executive Order 13129 (July 4, 1999), attached as Exhibit 4.  President Clinton

renewed this declaration the following year.  *See* Presidential Notice of June 30, 2000, attached

as Exhibit 5.  President George W. Bush also renewed this same declaration in June 2001.

Compl. at ¶ 22; Presidential Notice of June 30, 2001, attached as Exhibit 6.

**IV.    The Death of Mrs. Faulkner and Thousands of Other Innocent Persons on
September 11, 2001.**

On the morning of Tuesday, September 11, 2001, nineteen agents of Defendants Al

Qaeda and Bin Laden hijacked four, fully-fueled jetliners in the United States with the intention

of crashing them into the World Trade Center in New York City, the Pentagon outside

Washington, D.C., and one other, unknown target in Washington, D.C., presumably either The

White House or the Capitol.  Compl. at ¶ 11; 9/11 Rep. at 1-14, 149, 150, 153-173, 223-227,

231-240, 243-245, 248, 249, 260-263, 363.  U.S. officials reportedly concluded that fifteen of the

hijackers were Saudi Arabian nationals.  Compl. at ¶ 12; 9/11 Rep. at 155, 231, 232.  Two other

hijackers were from the United Arab Emirates.  Compl. at ¶ 12; 9/11 Rep. at 162, 231.  One was

from Lebanon, and one was from Egypt.  Compl. at ¶ 12; 9/11 Rep. at 160, 163.  Most, if not all,

of the nineteen hijackers entered the United States on falsified passports.  Compl. at ¶ 12; 9/11

Rep. at 235.

At approximately 8:46 a.m., one of the hijacked airliners, American Airlines Flight 11

carrying 92 persons, struck the North Tower of the World Trade Center.  Compl. at ¶ 13; 9/11

Rep. at 4-7, 32, 285-287, 312.  At approximately 9:02 a.m., a second hijacked airliner, United

Airlines Flight 175 carrying sixty-five persons, struck the South Tower of the World Trade

Center.  Compl. at ¶ 14; 9/11 Rep. at 7, 8, 32, 293-296, 312.

Mrs. Faulkner was attending a one-day meeting on the 104th floor of the South Tower

when it was struck by Flight 175 several floors below.  Compl. at ¶ 19; Faulkner Decl. at ¶ 11.

Based on an account subsequently provided by a colleague of Mrs. Faulkner who escaped the

South Tower, Mrs. Faulkner survived the crash of the airliner into the Tower.  *Id.*  The colleague

recalls seeing Mrs. Faulkner unsuccessfully trying to board an over-crowded elevator in the

minutes following the crash.  *Id.*  At approximately 9:58 a.m., just short of one hour after being

struck by the hijacked airliner, the South Tower collapsed, killing all inside, including Mrs.

Faulkner.  Compl. at ¶ 16; 9/11 Rep. at 305, 306; Faulkner Decl. at ¶ 11.

## V.    <u>Procedural Background</u>.

Plaintiff initiated this action on December 4, 2001.  Plaintiff effected service of process

on Defendant Afghanistan through diplomatic channels, and, according to the return of service

affidavit filed by the U.S. Department of State on August 20, 2002, Defendant Afghanistan was

served with a Notice of Suit, Summons and a copy of the Complaint on or about July 31, 2002.

*See* Affidavit Requesting Entry of Default Against Defendant The Islamic Emirate Of

Afghanistan (Docket Entry No. 14).  Despite being served with process, Defendant Afghanistan

failed to enter an appearance, file a responsive pleading, or otherwise seek an extension of time

in which to respond within sixty days of service of process.  *Id.*  As a result, Plaintiff requested

that a default be entered against Defendant Afghanistan.  *Id.*  On January 29, 2003, the Clerk of

Court entered a default against Defendant Afghanistan. *See* Rule 55(a) Default of Defendant

The Islamic Emirate Of Afghanistan (Docket Entry No. 16).[4]

By Order dated May 27, 2003, the Court granted Plaintiff permission to effect service of

process on Defendants Al Qaeda, Bin Laden, and the Taliban by publication. *See* May 27, 2003

Order on Motion for Service by Publication (Docket Entry No. 19). Plaintiff published the

approved Legal Notice in the manner approved by the Court. *See* Affidavit of Service of

Original Process Upon Certain Defendants (Docket Entry No. 21). When Defendants Al Qaeda,

Bin Laden, and the Taliban failed to enter an appearance, file a responsive pleading, or otherwise

seek an extension of time in which to respond within 60 days of service, Plaintiff requested entry

of a default. *See* Affidavit in Support of Default (Docket Entry No. 37). The Clerk of Court

entered defaults against Defendants Al Qaeda, Bin Laden, and the Taliban on September 29,

2005. *See* Default (Docket Entry No. 38).

VI.     **Subject-Matter and Personal Jurisdiction.**

The Court plainly has subject-matter jurisdiction over Plaintiff's conspiracy and

wrongful claims against Defendant Afghanistan. Pursuant to 28 U.S.C. § 1330(a), the district

courts of the United States have original jurisdiction over civil actions against foreign states not

entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. 1602, *et*

*seq*. In addition, this Court also has supplemental jurisdiction over Plaintiff's claims against

Defendant Afghanistan pursuant to 28 U.S.C. § 1367(a), as these claims are so related to

---

[4]     More than a year later, and more than eighteen months after it was served with
process, Defendant Afghanistan moved to vacate the "default judgment." *See* Motion of the
Transitional Islamic State of Afghanistan to Vacate Default Judgment and Dismiss Claims
Against Afghanistan (Docket No. 26). Plaintiff opposed Defendant Afghanistan's motion. The
matter has been fully briefed and is awaiting the Court's ruling.

Plaintiff's Anti-Terrorism Act claims against Defendants Taliban, Al Qaeda, and Bin Laden that they form part of the same case or controversy under Article III of the U.S. Constitution.

Defendant Afghanistan is not entitled to immunity under the "tortious act or omission" exception to the FSIA.  This provision provides that a foreign state shall not be immune from the jurisdiction of courts of the United States in any case

> not otherwise encompassed in paragraph (2) above in which money damages are sought against a foreign state for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state or of any official on or employee of that foreign state while acting within the scope of his office or employment; except
>
> > **(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
> >
> > **(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contractual rights.

28 U.S.C. § 1605(a)(5).  Plaintiff's claims clearly do not fall within the "commercial activity" exception to the FSIA, 28 U.S.C. § 1605(a)(2).  Mrs. Faulkner was killed in the United States as a result of the tortious acts of Defendant Afghanistan, namely, conspiring with Defendants Taliban, Al Qaeda, and Bin Laden to commit multiple unlawful acts, including assault and battery, false imprisonment, intentional infliction of emotional distress, and violations of the Anti-Terrorism Act, in the course of the September 11, 2001 attacks on the World Trade Center. It simply cannot be said that conspiring to commit a terrorist attack falls within the "discretionary function" exception to the tortious act exception to the FSIA.  *See*, *e.g.*, *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate . . . action that is clearly contrary to the precepts of humanity as recognized in both national and international law.").  Because Defendant

Afghanistan is not entitled to immunity under "tortious acts or omission" exception to the FSIA and because Plaintiff properly effectuated service of process on Defendant Afghanistan through diplomatic channels, the Court has personal jurisdiction over Defendant Afghanistan.

The Court plainly has subject matter jurisdiction over Defendants Taliban, Al Qaeda, and Bin Laden under 28 U.S.C. § 1331, as Plaintiff has asserted claims against these defendants under federal law, namely, the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq*. In addition, the Court has diversity jurisdiction over Plaintiff's claims against Defendants Taliban, Al Qaeda, and Bin Laden under 28 U.S.C. § 1332, as Plaintiff is a U.S. national, Defendants Taliban, Al Qaeda, and Bin Laden are foreign citizens and/or subjects, and the amount in controversy exceeds $75,000. Finally, the Court has supplemental jurisdiction over Plaintiff's wrongful death and common law assault and battery, false imprisonment, and intentional infliction of emotional distress claims against Defendants Taliban, Al Qaeda, and Bin Laden pursuant to 28 U.S.C. § 1367(a), as these statutory and common law claims are so related to Plaintiff's Anti-Terrorism Act claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

The Court also has personal jurisdiction over Defendants Taliban, Al Qaeda, and Bin Laden as well. To establish personal jurisdiction over a foreign defendant that does not reside in any judicial district within the United States, a plaintiff must show: (1) service of a summons has been effectuated; (2) authorization for service of a summons on the defendant; and (3) a constitutionally sufficient relationship exists between the defendant and the forum. *Mwani*, 417 F.3d at 8. First, and as previously demonstrated, Plaintiff served Defendants Taliban, Al Qaeda, and Bin Laden by publication. Second, Rule 4(k)(2) of the Federal Rules of Civil Procedure authorized service of a summonses on Defendants Taliban, Al Qaeda, and Bin Laden, and

Plaintiff effectuated service by publication.  *See* Affidavit of Service of Original Process Upon

Certain Defendants (Docket Entry No. 21).

Third, as the Court declared in *Mwani*:

> Whether the exercise of jurisdiction is 'consistent with the Constitution' for
> purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts
> with the United States as a whole to justify the exercise of personal jurisdiction
> under the Due Process Clause of the Fifth Amendment.  The Clause protects an
> individual's liberty interest in not being subject to the binding judgments of a
> forum with which he has established no meaningful contacts, ties, or relations,
> and requires that individuals have fair warning that a particular activity may
> subject them to the jurisdiction of a foreign sovereign.  Where a forum seeks to
> assert specific jurisdiction over an out-of-state defendant who has not consented
> to suit there, this fair warning requirement is satisfied if the defendant has
> purposefully directed his activities at residents of the forum, and the litigation
> results from alleged injuries that arise out of or relate to those activities.

*Id.* at 12 (citations and internal quotation marks omitted).  Accordingly, jurisdiction may attach if

the "defendant's conduct is aimed at or has an effect in the forum state."  *Id.* at 13.  The D.C.

Circuit has stated further that the focus on contacts with the forum cannot be too specific or

narrow.  *Id.*  Specifically, if a foreign defendant directs its actions toward the United States and

its citizens as a whole, then the impact will necessarily be felt in all forums by any American

citizen.  *Id.*

In this case, Defendants Taliban, Al Qaeda, and Bin Laden have not conceded to the

jurisdiction of any state.  *Mwani*, 417 F.3d at 11 ("[S]o long as a defendant does not concede to

jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction.") (citation and

internal quotation marks omitted).  Lastly, "there is no doubt that the defendants engaged in

unabashedly malignant actions directed at and felt in this forum."  *Id.* at 13 (citations and

internal quotation marks omitted) (D.C. Circuit found that Bin Laden and Al Qaeda are subject

to personal jurisdiction in this forum because they have directed their terrorist attacks at all U.S.

citizens.).  Indeed, Plaintiff has described an "ongoing conspiracy to attack the United States,

with overt acts occurring within this country's borders."  *Id.*  Bin Laden, Al Qaeda, and the

Taliban "purposefully directed their activities at residents of the United States," and this

litigation results from injuries that "arise out of or relate to those activities."  *Id.*  Thus,

Defendants had "fair warning" that their activities would subject them to the jurisdiction of the

United States, and, as a result, this forum has personal jurisdiction over Defendants Taliban, Al

Qaeda, and Bin Laden.

**VII.    Venue.**

Venue is proper in this judicial district because, pursuant to 28 U.S.C. § 1391(d), an

alien, in this case Defendants Taliban, Al Qaeda, and Bin Laden, "may be sued in any district,"

and, pursuant to 28 U.S.C. § 1391(f)(4), civil actions against a foreign state, in this case

Defendant Afghanistan, may be brought in the U.S. District Court for the District of Columbia.

**VIII.   Plaintiff Is Entitled to Entry of Default Judgments Against Defendants
Afghanistan, the Taliban, Al Qaeda and Bin Laden.**

**A.      Legal Standards for Entry of a Default Judgment.**

A default judgment may be entered when a defendant fails to defend its case

appropriately or otherwise engages in dilatory tactics.  *Keegel v. Key West & Caribbean Trading

Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980).  Rule 55(b)(2) of the Federal Rules of Civil

Procedure authorizes entry of default judgments upon application of a party entitled to a

judgment.

Ordinarily, a defaulting defendant is deemed to admit every well-pleaded allegation in

the complaint.  *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001).  The failure of a

defaulting defendant to appear concludes the liability phase of the lawsuit.  *Rubin v. Hamas-*

*Islamic Resistance Movememt*, 2004 U.S. Dist. LEXIS 20883, *4 (D.D.C. September 27, 2004)

(citing *Brock v. Unique Racquetball & Health Clubs, Inc.*, 786 F.2d 61, 65 (2d Cir. 1986).  In

order to obtain a default judgment against a foreign sovereign, however, a plaintiff must

establish a right to a relief by evidence satisfactory to the court.  28 U.S.C. § 1608(e).  This

"satisfactory to the court" standard is identical to the standard for entry of default judgments

against the United States in Federal Rule of Civil Procedure 55(e).  *Campuzano v. Islamic*

*Republic of Iran*, 281 F. Supp. 258, 268 (D.D.C. 2003).  A plaintiff may establish such proof by

affidavit, and, in evaluating the plaintiff's proof, a court may "accept as true the plaintiffs'

uncontroverted evidence."  *Id.*  Because Plaintiff's claim against Defendant Afghanistan is

essentially a claim for conspiring with Defendants Taliban, Al Qaeda, and Bin Laden to commit

multiple unlawful acts in the course of the September 11, 2001 attacks, Plaintiff will apply the

higher evidentiary standard of 28 U.S.C. § 1608(e) to all four defendants.  Plaintiff relies on his

own affidavit and the official findings of the 9/11 Report to satisfy this evidentiary standard.

### B.    Choice of Law.

Because Plaintiff's Complaint include both federal and state law claims, it is necessary to

determine which state's law applies to Plaintiff's state law claims.  Because the District of

Columbia is the forum state, its choice of law rules govern this determination.  *Dammarrell v.*

*Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343, * 57 (D.D.C. March 29, 2005).  The

District of Columbia's choice of law rules employ a "constructive blending" of the "government

interests" analysis and the "most significant relationship" test.  *Id.*  Under the government

interests" analysis, a court must "evaluate the governmental policies underlying the applicable

laws and determine which jurisdiction's policy would be most advanced by having its law

applied to the facts of the case under review."  *Id.* at *58.  As for the "most significant

relationship" test, courts look to a number of considerations, including (1) the place where the

injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile,

residence, and nationality of the parties; and (4) the place whether the relationship, if any,

between the parties is centered. *Id.* at *58-59. In *Dammarrell*, a lawsuit arising from the 1983

bombing of the U.S. Embassy in Beirut, the Court noted that "certain patters have developed in

the law in similar cases that guide the inquiry." *Id.* at *59. The Court continued:

> The most important of these is the recognition that the law of the injured person's
> domicile should govern the issue of compensatory damages in wrongful death
> actions arising out of mass disasters because that locale has an important and
> obvious interest in ensuring that its residents are fully and adequately
> compensated for tortious harm.

*Id.* at *60 (quotations and citations omitted). The Court in *Dammarell* thus applied the law of

the domicile of the plaintiff. *Id.* at 66. Because Plaintiff and Mrs. Faulkner were domiciled in

the State of Ohio at the time of Mrs. Faulkner's death, Plaintiff's state law claims should be

governed by the law of the State of Ohio.

### A.    Assault and Battery (Defendants Al Qaeda and Bin Laden).

Under Ohio law, the tort of assault is defined as the "willful threat or attempt to harm or

touch another offensively, which threat or attempt reasonably places the other in fear of such

contact." *Smith v. John Deere, Co.*, 614 N.E.2d 1148, 1154 (Ohio Ct. App. 1993). A key

element of the tort is "that the actor knew with substantial certainty that his or her act would

bring about harmful or offensive contact." *Id.* A battery is "an intentional unconsented-to

contact with another." *Snyder v. Turk*, 90 Ohio App. 3d, 627 N.E.2d 1053 (1993). Stated

another way, an assault is the beginning of an act which, if consummated, would constitute

battery. *Collin v. Stephenson*, 2002 U.S. Dist. LEXIS 21573, at *43, 44 (S.D. Ohio 2002) (citing

*Matlock v. Ohio Dep't of Liquor Control*, 665 N.E.2d 771 (1996)). In order to establish a claim

16

for battery, "a party must show that the defendant: (1) intended to cause harmful or offensive

contact; and (2) that harmful contact resulted." *Aker v. New York & Co.*, 364 F. Supp. 2d 661,

668 (N.D. Ohio 2005) (citing *Love v. City of Port Clinton*, 524 N.E.2d 166 (Ohio 1988)).

Damages available under Ohio law for assault and battery include not only damages for the act

itself, but also damages for resulting pain and suffering. *Harris v. B & M Groceries*, 1983 Ohio

App. LEXIS 14488, *3-4 (Ohio C. App. Aug. 4, 1983) (internal citations and quotations

omitted).

The 9/11 Report provides convincing evidence that agents of Defendants Al Qaeda and

Bin Laden intentionally crashed a fully-fueled airliner into the South Tower of the World Trade

Center, causing the building to ignite and collapse and resulting in Mrs. Faulkner's death.  9/11

Rep. at 1-14, 32, 293-296, 312; *see also* Faulkner Decl. at ¶¶ 3, 11-12.  There can be no doubt

that this act was intended to cause persons inside the building, such as Mrs. Faulkner, to suffer

not only fear of offensive and harmful contact, but also actual harmful contact.  *Id.*  As a result,

Plaintiff is entitled to a default judgment against Defendants Al Qaeda and Bin Laden for assault

and battery committed against Mrs. Faulkner.

   **B.     False Imprisonment (Defendants Al Qaeda and Bin Laden).**

Ohio law defines the tort of false imprisonment as "the intentional confinement of

another 'without lawful privilege and against his consent within a limited area for any

appreciable time, however short.'" *Bennett v. Ohio Dep't of Rehab. and Corr.*, 573 N.E.2d 633

(1991) (quoting *Feliciano v. Kreiger*, 362 N.E.2d 646 (1977)).  Damages available under Ohio

law for a claim of false imprisonment include lost wages, humiliation, mental suffering and

anguish, and indignity.  *See Kalbfell v. Marc Glassman, Inc.*, 2003 Ohio App. LEXIS 3183, at

*33 (Ohio Ct. App. June 26, 2003) (citation omitted).

Again, the 9/11 Report provides convincing evidence that agents of Defendants Al Qaeda and Bin Laden intentionally crashed a fully-fueled airliner into the South Tower of the World Trade Center, causing the building to ignite, and that, as a result, a great many persons, including Mrs. Faulkner, were trapped inside the burning building before it collapsed.  9/11 Rep. at 1-14, 32, 293-296, 312; Faulkner Decl. at ¶¶ 3, 11, 12.  Clearly, at no point did Mrs. Faulkner consent to being trapped inside a burning building that was about to collapse.  As a result, Plaintiff is entitled to a default judgment against Defendants Al Qaeda and Bin Laden for false imprisonment of Mrs. Faulkner.

### C.   Intentional Infliction of Emotional Distress (Defendants Al Qaeda and Bin Laden).

To prevail on such a claim for intentional infliction of emotional distress under Ohio law, a plaintiff must establish that:  (1) the defendant intended to cause the plaintiff serious distress; (2) its conduct was extreme and outrageous; and (3) its action was a proximate cause of plaintiff's serious emotional distress.  *Aker*, 364 F. Supp. 2d at 667; *Phung v. Waste Mgmt.*, 644 N.E.2d 286 (Ohio 1994).  In this regard, Ohio has adopted the standard set forth in the Restatement (Second) of Torts, which states, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting *Restatement (Second) of Torts*, § 46(l) (1965)).

Again, the 9/11 Report provides convincing evidence that agents of Defendants Al Qaeda and Bin Laden intentionally crashed a fully-fueled airliner into the South Tower of the World Trade Center, causing the building to ignite and collapse and killing thousands of persons.

Without question, such conduct is extreme and outrageous.  *See In Re Terrorist Attacks of September 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005) (declaring that September 11, 2001 attacks were "undoubtedly extreme and outrageous"); *Burnett v. Al Baraka Inv. & Dev. Group*, 274 F. Supp. 2d 86, 108 (D.D.C. 2003) (noting that "the terrorist acts of September 11 would appear to be a perfect fit for the elements of intentional infliction of emotional distress"). Nor can it be reasonably disputed that Defendants Al Qaeda and Bin Laden intended persons trapped inside the burning South Tower to suffer serious emotional distress, or that such persons, including Mrs. Faulkner, actually suffered such distress as a result.  Consequently, Plaintiff is entitled to a default judgment against Defendants Al Qaeda and Bin Laden for the emotional distress they intentionally caused Mrs. Faulkner to suffer.

> **D.     Violation of the Anti-Terrorism Act (Defendants Taliban, Al Qaeda, and Bin Laden.**

The Anti-Terrorism Act provides a civil cause of action for U.S. nationals injured by an act of international terrorism.  The relevant statute states:

> Any national of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333.  The term "acts of international terrorism" is defined as meaning activities that

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended -- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).  The Anti-Terrorism Act has been interpreted to encompass the funding of terrorist activities where such funding is provided "with knowledge of and intent to further" violent acts that are reasonably foreseeable as a result of the funding.  *See Burnett*, 274 F. Supp. 2d at 106.

Once again, the 9/11 Report provides convincing evidence that agents of Defendants Al Qaeda and Bin Laden intentionally crashed a fully-fueled airliner into the South Tower of the World Trade Center, causing the building to ignite and collapse and killing thousands of persons. Such conduct clearly constitutes acts of international terrorism under the Anti-Terrorism Act.  In addition, the 9/11 Report also provides convincing evidence that Defendant Taliban knowingly and intentionally provided material support and assistance to Defendants Al Qaeda and Bin Laden to commit the terrorist attacks against the United States, including the September 11, 2001 attacks that resulted in the death of Mrs. Faulkner.  As the Court in *Burnett* found:

> Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given [the plaintiffs'] allegations that, prior to September 11, al Qaeda and Osama Bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens and had accompanied these words with actions by implementing, and publicly acknowledging responsibility for, such terrorist schemes as the 1993 bombing of the World Trade Center, the 1998 attack of U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen.

*Burnett*, 274 F. Supp. 2d at 105 (internal citations omitted).  Plaintiff respectfully submits that, for purposes of an Anti-Terrorism Act claim, there is no material difference between knowingly and intentionally providing funding to further acts of international terrorism and knowingly and intentionally providing other forms of material support and assistance to further such acts. Consequently, Plaintiff is entitled to a default judgment against Defendants Taliban, Al Qaeda, and Bin Laden for a violation of the Anti-Terrorism Act.

**E.      Conspiracy (Defendants Afghanistan and Taliban).**

A civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff

may recover damages.   *Gosden v. Louis,* 687 N.E.2d 481, 497-98 (Ohio Ct. App. 1996).   The

Supreme Court of Ohio defines civil conspiracy as "a malicious combination of two or more

persons to injure another in person or property, in a way not competent for one alone, resulting in

actual damages."  *Kenty v. Transamerican Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995);

*LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987); *Aetna Cas. & Sur.*

*Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000).   In order to establish a claim of

civil conspiracy, a plaintiff must establish the following four elements:  (1) a malicious

combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an

unlawful act independent from the actual conspiracy.  *Universal Coach, Inc. v. New York City*

*Transit Auth., Inc.*, 65 N.E.2d 28, 33 (Ohio Ct. App. 1993).  Damages are recoverable if "caused

by a tort committed in furtherance of the conspiracy."  *Ziegler v. Findlay Indus.*, 380 F. Supp. 2d

909, 914 (N.D. Ohio 2005).

The elements of civil conspiracy are clearly met here.  First, the Taliban's material

support and assistance to Bin Laden and Al Qaeda in light Bin Laden and Al Qaeda's proclaimed

"intentions to commit murderous terrorist activities against the United States and its citizens . . .

and had accompanied these words with actions by implementing, and publicly acknowledging

responsibility for, such terrorist schemes as the 1993 bombing of the World Trade Center, the

1998 attack of U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in

Yemen" supports a reasonable inference that there was an agreement concerning the commission

of terrorist acts, including the attacks of September 11, 2001.  *Burnett*, 274 F. Supp. 2d at 105

(Court found a reasonable inference could be drawn about the existence of an agreement concerning the commission of terrorist attacks because individuals provided financing to Al Qaeda). Second, the overt act was the terrorist attacks of September 11, 2001. Third, the Taliban intentionally participated in the furtherance of the plan or purpose by: (1) providing material support and assistance to Bin Laden and Al Qaeda in carrying out terrorist attacks against the United States, including the September 11, 2001 attacks;[1] (2) facilitating and allowing Bin Laden and Al Qaeda to operate training camps inside Afghanistan from which they sift recruits, plan, train for, and carry out terrorist attacks against the United States, including the September 11, 2001 attacks;[2] (3) facilitating meetings and travel for those involved in the September 11, 2001 plot;[3] (4) funding Bin Laden when he arrived in Afghanistan until he was able to reinvigorate his fund-raising efforts;[4] (5) receiving $10-$20 million per year from Bin Laden in return for safe haven;[5] and (6) refusing to expel Bin Laden and Al Qaeda from Afghanistan despite knowledge of his terrorist activities.[6] Lastly, Plaintiff has provided sufficient evidence of the damages caused as a result of the conspiracy.[7]

Afghanistan provided material support of and engaged in conspiratorial efforts with Bin

---

[1]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 66, 67, 123, 125, 156, 157, 165, 166, 168, 169, 170, 171, 365, 366, 369.

[2]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 156, 157, 233-236.

[3]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 66, 165, 166, 168, 169, 235.

[4]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 170.

[5]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 171.

[6]    Compl. at ¶¶ 21, 22; 9/11 Rep. at 121, 122, 125, 176, 182, 183, 185, 205.

[7]    *See* Section IX, *infra*.

22

Laden and Al Qaeda.  As a result, the Court should also enter a default judgment against Afghanistan for the unlawful acts of its co-conspirators as set forth above.

The evidence of its Afghanistan's involvement is overwhelming and uncontroverted. Since approximately 1996, Bin Laden and Al Qaeda have received material support and assistance from Afghanistan, by and through officials, agents and/or employees of the Taliban in carrying out terrorist attacks against the United States, including the September 11, 2001 attacks. 9/11 Rep. at 66, 67, 123, 125, 156, 157, 165, 166, 168, 169, 170, 171, 365, 366, 369.  Many of the nineteen hijackers from the September 11, 2001 attacks received training at camps in Afghanistan run by Bin Laden and Al Qaeda.  *Id.* at 156, 157, 233-236.  Afghanistan, by and through officials, agents and/or employees of the Taliban, facilitated meetings and travel for those involved in the September 11, 2001 plot.  *Id.* at 66, 165, 166, 168, 169, 235.  Despite numerous requests from the Untied States and others, Afghanistan, by and through officials, agents and/or employees of the Taliban, refused to expel Bin Laden and Al Qaeda from Afghanistan.  Id. at 121, 122, 125, 176, 182, 183, 185, 205.

In 1999, the U.S. Government declared that Afghanistan had become "a safe haven and base of operations" from which to carry out terrorist attacks on the United States.  Specifically, President William J. Clinton declared in a July 4, 1999 Executive Order:

> I, William Jefferson Clinton, President of the United States of America, find that the actions and policies of the Taliban in Afghanistan, in allowing territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama Bin Laden and the al-Qaeda (sic) organization who have committed and threaten to continue to commit acts of violence against the United States and its nationals, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat.

Executive Order 13129 (July 4, 1999), attached hereto as Exhibit 4.  On June 30, 2000, President

Clinton continued this same Executive Order  (*See* Presidential Notice of June 30, 2000 (attached

as Exhibit 5).  Likewise, President George W. Bush continued this same Executive Order, using

nearly identical language, in a notice issued on June 30, 2001.  Compl. at ¶ 22; Presidential

Notice of June 30, 2001, attached hereto as Exhibit 6.

### F.    Wrongful Death (Defendants Afghanistan, Taliban, Al Qaeda and Bin Laden).

An action for wrongful death under Ohio law is governed by Ohio's wrongful death

statute.  This statute provides in relevant part:

> When the death of a person is caused by wrongful act, neglect, or default which
> would have entitled the party injured to maintain an action and recover damages if
> death had not ensued, the person who would have been liable if death had not
> ensued, or the administrator or executor of the estate of such person, as such
> administrator or executor, shall be liable to an action for damages,
> notwithstanding the death of the person injured and although the death was caused
> under circumstances which make it aggravated murder, murder, or manslaughter.

*See* Ohio Rev. Code Ann. ("ORCA") § 2125.01 (2006).

A civil action under this statute may be brought "in the name of the personal

representative of the decedent for the exclusive benefit of the surviving spouse, the children, . . .

[as well as] the other next of kin of the decedent."  Ohio Rev. Code Ann. § 2125.02(A)(1).

Available compensatory damages for a wrongful death action include pecuniary damages, loss of

support, services, society and prospective inheritance, as well as pain and suffering incurred by

the bereaved plaintiff.  ORCA § 2125.02(B).  The surviving spouse and children of the decedent

are "rebuttably presumed to have suffered damages by reason of wrongful death.  ORCA §

2125.02(A)(1).

24

In this case, there can be no question that Plaintiff, as personal representative of the estate of his deceased wife, has sufficiently pleaded a claim for wrongful death under ORCA § 2125.02. Defendants Afghanistan, Taliban, Al Qaeda, and Bin Laden orchestrated and carried out the attack on the South Tower of the World Center, which directly caused the death of Mrs. Faulkner.  Accordingly, Defendants Afghanistan, Taliban, Al Qaeda, and Bin Laden are liable to Plaintiff, in his capacity as personal representative of the estate of Mrs. Faulkner, for the damages Plaintiff and his and Mrs. Faulkner's children suffered as a result of Mrs. Faulkner's death.

## IX.   **Plaintiff's Damages.**

Entry of a default alone does not establish "liability for the amount of damage that the plaintiff claims." *Id.* at 5.  "Instead, 'unless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded.'" *Id.* (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001).  "The court has considerable latitude in determining the amount of damages." *Id.* at 5.  "To fix the amount, the court may conduct a hearing." *Id.* (citing Fed.R.Civ. P. 55(b)(2)).  "The court is not required to do so, however, as long as it ensures that there is a basis for the damages specified in the default judgment." *Id.* at 5, 6 (citation and internal quotation marks omitted).    As a direct and proximate result of the intentional, willful, and malicious acts of terrorism by Afghanistan and the other Defendants on September 11, 2001, Plaintiff, Plaintiff's decedent wife, and Plaintiff's other family members suffered severe and permanent personal injuries, damages, and losses, as discussed more fully below.

As a result of their wrongful conduct, the non-sovereign Defendants that have failed to appear in this lawsuit (Bin Laden, Al Qaeda, Taliban) are liable for damages to Plaintiff under

the ATA (including treble damages) and under multiple bases of Ohio law.  Afghanistan also is liable since a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. § 1606.[8]  Plaintiff, as an individual and in his capacity and as personal representative of the estate of Wendy Faulkner, is entitled to recover for economic loss, pain and suffering, and loss of solatium.

### A.     Economic Damages

Plaintiff is entitled to economic damages, primarily lost earnings,  in the amount of $2,415,517.31, as set forth in the economist's report attached hereto as Exhibit 7.  The report, which was originally prepared in support of an application to the Victims Compensation Fund for victims of 9/11, calculates the value of the lost earnings of Wendy Faulkner.  *See* Faulkner Decl. ¶ 16.  Lost earnings consist of the salary and benefits, less personal maintenance expenses and taxes, that it is projected Wendy would have earned over the remainder of her work life.  *Id.*  The estimate has been further reduced to their present value.  The above estimate assumes a bonus of 35 percent, as explained in the report.  As provided under the ATA, this figure should be trebled as to the non-state Defendants, resulting in a total award for economic loss in the amount of $7,246,551.93.

---

[8]     Plaintiff recognizes that the D.C. Circuit has "now established that generic common law cannot constitute a cause of action against a foreign sovereign state in suits under th FSIA.  *Beecham v. Socialist People's Libyan Arab Jamahiriya*, 2007 U.S. Dist. LEXIS 24177 (D.D.C. March 31, 2007) (citing *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004).  Plaintiff maintains, however, that he has adequately alleged a "coherent alternatives" to generic common law claims, under both the ATA and Ohio law.  Morever, Plaintiff has provided more than "fair notice of what [his] claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

## B.    Pain and Suffering

In assessing non-economic damages, this Court has been guided by prior decisions

awarding damages for pain and suffering of victim of terrorism.  *Prevatt v. Islamic Republic of*

*Iran*, 421 F. Supp. 2d 152, 160 (D.D.C. 2006) (a court "may look to prior decisions awarding

damages for pain and suffering, and to those awarding damages for solatium."); *Haim*, 425 F.

Supp. 2d at 71. Plaintiff, as personal representative of the estate, is entitled to recover for the pain

and suffering endured by Wendy before and at her death.

As attested to in Plaintiff's declaration, credible evidence indicates that Wendy survived

the initial impact of airplane into the World Trade Center's South Tower.  Faulkner Decl. ¶ 11.

According to one her co-workers, Wendy was seen alive and was trying to get on to an elevator

to exit the building.  *Id.*  Unfortunately, the elevator was full, preventing Wendy's escape.  *Id.*

Wendy likely died when the building collapsed, approximately 56 minutes after the crash.  *Id.*;

Compl. ¶ 16.

One court has considered precisely these circumstances in assessing the appropriate

award for pain and suffering for a 9/11 victim.  *Smith v. Islamic Emirate of Afghanistan*, 262 F.

Supp. 217, 238-39 (S.D.N.Y. 2003).  In *Smith*, one victim (Timothy Soulas) similarly was

reported to have survived the impact, but was unable to escape, in his case, the North Tower

before its collapse.  *Id.*  The *Smith* court noted specifically that the time period after the crash and

before death for the victim must have been "psychologically excruciating" and that death was

likely "very painful."  *Id.*  The court awarded $2.5 million in compensation.  *Id.*  Because, like

the victim in *Smith*, Wendy Faulkner similarly survived the impact and endured pain and

suffering prior to her death, an award for her pain and suffering should be entered in the amount

of $2.5 million.  The amount should be trebled as to the non-state Defendants as provided for under the ATA.

## C.      Loss of Solatium

As a result of the unconscionable acts of Defendants, Plaintiff has suffered and will continue to suffer severe mental grief and loss of society and comfort.  *See* Faulkner Decl. ¶¶ 12-15.  Awards in similar cases again provide guidance as to the appropriate amount to award a victim's relatives for a death caused by a terrorist act.

In cases involving acts of terrorism, a claim for solatium is the equivalent to a claim for intentional infliction of emotional distress.  *Surrette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n. 5 (D.D.C. 2002) ("In the context of FSIA cases, this Court has recognized the claim of solatium as . . . indistinguishable from the claim of intentional infliction of emotional distress."); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n. 11 (D.D.C. 2001) (noting that, in an intentional homicide case, "solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress").

In terrorism cases in which the victims have died, courts "typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse . . . ."  *Heiser*, 2006 U.S. Dist. LEXIS 92640 at *67 (citing, *e.g.*, *Anderson v Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (awarding $10 million to the wife of a hostage and torture victim); *Weinstein*, granting $8 million to the widow of a bus bombing victim); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (awarding $10 milllion to the widow of a murder victim).  Significantly, in *Smith*, a 9/11 victim's spouse was award $10 million for the resulting mental anguish.  *Smith*, 262 F. Supp. at 239.  Consistent with this precedent, in this

case, Plaintiff likewise should be awarded $10 million for his suffering.  The award against the non-sovereign Defendants should be trebled.

**X.**      **Conclusion.**

For the reasons set forth above, Plaintiff respectfully requests that a final default judgment be entered in his favor against Defendants Afghanistan, the Taliban, Al Qaeda, and Bin Laden as follows:

| | | | |
|---|---|---|---|
| Economic Damages | $2,415,517.31 | (x 3 | $7,246,551.93) |
| Pain and Suffering | $2,500,000 | (x 3 | $7,500,000) |
| Loss of Solatium | $10,000,000 | (x 3 | $30,000,000) |
| **Total** | **$14,915,517.93** | | **$44,746,551.93** |

Hence, the Court should award in total $44,746,551.93, of which sovereign Defendant Afghanistan is liable for $14,915,517.93.

Dated:  September 11, 2007                                  Respectfully submitted,

JUDICIAL WATCH, INC.

/s/ Paul J. Orfanedes
D.C. Bar No. 429716

/s/ James F. Peterson
D.C. Bar No. 450171
501 School Street, S.W.
Suite 500
Washington, D.C. 20024
Tel.: 202-646-5172
Fax: 202-646-5199

*Attorneys for Plaintiff*

29